IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

SEP 07 2005

GREG[illegible]

Civil Action No. 00-cv-01031-RPM

RAFI M. KHAN,

Plaintiff,

v.

NEW FRONTIER MEDIA, INC., and
MICHAEL WEINER,

Defendants.

---

FINDINGS, CONCLUSIONS AND ORDER FOR JUDGMENT

---

On the evidence presented at trial the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

The plaintiff, Rafi Khan, has had a lengthy career in what can be described generically as corporate financing. He was a licensed broker with the securities and underwriting firm of Joseph Charles & Associates ("Joseph Charles") where Richard Rappaport was also employed. In 1997 Joseph Charles became the underwriter for an initial public offering of common stock and warrants for a company called Ontro. In April, 1998, Rappaport and some other employees of Joseph Charles left that firm and opened an office for Cohig & Associates, Inc., ("Cohig") in Los Angeles, California, for the purpose of providing investment banking services for Cohig, a securities broker/dealer firm with its principal office in Englewood, Colorado.[1] At Khan's urging, Ontro transferred its underwriting agreement from Joseph Charles to Cohig and Cohig, through Rappaport, agreed to compensate Khan by paying compensation and post-trading benefits when the Ontro offering closed.

---

[1]Cohig & Associates, Inc. became EBI Securities Corporation in 1998 and then Global Capital Corporation. For convenience it is referred to as Cohig throughout.

Khan, Rappaport and a corporate representative of Ontro generated interest in the Ontro stock and warrants in the course of a "road show" in various cities.

New Frontier Media, Inc., ("New Frontier") is a public corporation primarily engaged in the electronic distribution of adult entertainment content through subscription/pay-per-view television, DVD and the Internet. The company was seeking to expand its business in early 1998. Michael Weiner, then executive vice president of New Frontier, was acquainted with Rafi Khan, having met him several years earlier in Las Vegas, Nevada, in connection with a proposed investment in a hotel and casino there. Khan introduced Rappaport to Weiner suggesting that New Frontier engage Cohig to assist in obtaining financing for the projected expansion of New Frontier's business. Weiner and Rappaport negotiated a letter agreement, dated April 24, 1998, described as an Investment Banking Consulting Agreement (Exhibit 5). In that agreement, Cohig was described as the "Consultant" with the following duties:

> 1. Duties of Consultant. Consultant shall, at the request of the Company, upon reasonable notice, render the following services to the Company from time to time:
>
> (a) Consulting Services. Consultant will provide such financial consulting services and advice pertaining to the Company's business affairs as the Company may from time to time reasonably request. Without limiting the generality of the foregoing, Consultant will assist the Company in developing, studying and evaluating, financing, merger and acquisition proposals, prepare reports and studies thereon when advisable, and assist in negotiations and discussions pertaining thereto. This agreement is not a contract for listing services; however, nothing in this agreement will prohibit Cohig & Associates, Inc. from listing or making a market in the Company's securities in the OTC markets, which markets might include the NASDAQ Small-Cap Market.
>
> (b) Financing. Consultant will assist and represent the Company in obtaining both short and long-term financing, if requested by the Company. The Consultant will be entitled to additional compensation under such terms as may be agreed to by the parties.
>
> (c) Wall Street Liaison. Consultant will, when appropriate, arrange meetings between representatives of the Company and individuals and financial institutions in the investment community, such as security analysts, portfolio managers and market makers.
>
> The services described in this Section I shall be rendered by Consultant without any direct supervision by the Company and at such time and place and in such manner (whether by conference, telephone, letter or otherwise) as Consultant may determine. (Exhibit 5)

The term of the agreement was for twelve months commencing April 24, 1998, and ending on April 24, 1999. The agreement provided for compensation as follows:

> 3. Compensation. As compensation for Consultant's services hereunder, the Company agrees to grant to Consultant a Warrant to purchase 250,000 shares of Common Stock (the "Stock"), at an exercise price of $3.375 per share, which is the closing price of such Stock on the date of this Agreement. This option shall be for a term of three years (3), with the underlying stock subject to a "piggy back registration rights exclusive of any filing made by company in connection with proposed private placement" at the next regular regulatory filing by the Company.

The form of the agreement had been provided to Rappaport by Khan. A draft had been sent to Weiner by facsimile transmission and he altered the draft to change the exercise price of the warrants from $3.00 to $3.375 per share, that being the closing price of New Frontier's publicly traded stock on April 24, 1998. The fully executed copy of the agreement was sent by facsimile transmission to Rappaport in the Los Angeles office of Cohig on April 28, 1998, by an employee of New Frontier.

Cohig never performed any services under the agreement and there is no credible evidence that anyone from New Frontier requested any specific services. Weiner testified that he attempted to call Rappaport several times but there is no documentation of such attempts in the record. Weiner also testified that he sent a letter, Exhibit C, dated May 24, 1998, to Rappaport indicating that New Frontier wanted to pursue a straight equity financing through either Cohig or a financial institution introduced by Cohig but there is no proof that the letter was actually sent or received and there is nothing to indicate any response or follow up upon a failure of response.

At the time of the negotiation of the investment banking consulting agreement, New Frontier was arranging a private placement with institutional investors of 1.75 million dollars of convertible debentures to fund the purchase of content for the launch of "The Erotic Network" and that was a reason for the limitation of the piggy back registration rights in the compensation paragraph of the agreement. That placement was completed in June, 1998.

The investment banking consulting agreement between Cohig and New Frontier

resulted from the initiative of Khan in arranging the introduction of Weiner to Rappaport. As between Rappaport and Khan, it was clear that Khan would perform the consulting services and provide financial public relations in promoting interest in New Frontier among Khan's many personal contacts with representatives of institutional investors. Cohig would be a necessary entity for any actual financial arrangements and any marketing of New Frontier securities. It was also agreed between Rappaport and Khan that he would be entitled to ninety per cent of the warrants under the agreement.

There is conflict in the testimony as to how much Weiner knew of Khan's participation when the agreement with Cohig was signed. Khan testified that he told Weiner that he would do the work with Cohig as the "enabler" and Rappaport testified that in his discussions with Weiner, the latter insisted upon Khan's performing the public relations part of the consulting services. Weiner denied that testimony and said that he was unaware of Khan's arrangement with Rappaport before September 1, 1999, when he received the following facsimile transmission from Rafi Khan.

> Hope you are well. We are entitled to "piggyback" on your 4/16/99 S3 filing (see enclosed agreement) Please call or have your SEC attorney call ASAP Best Wishes (Exhibit 24)

The enclosure with that note was the marked up draft of the investment banking consulting agreement. The evidence taken as a whole supports a finding that while the details were not made known to Weiner, he had reason to know that Khan would have some arrangement with Rappaport to share in the benefits of the bargain made with Cohig at the time of the execution of the contract.

When he received the note from Khan, Weiner referred the matter to attorney Frank Visciano who had previously done some legal work for New Frontier. Visciano was representing Cohig in defending a lawsuit in California brought by Khan seeking compensation for his services in connection with the Ontro offering.

Weiner then received a letter, dated September 8, 1999, from Thomas J. Poletti, a

lawyer in Beverly Hills, California, referring to the Cohig agreement and asserting a breach of that agreement by the failure to piggy back register shares underlying the warrant in a then pending registration of New Frontier stock being sold by selling shareholders. Visciano sent a copy of that letter to Russell Bean, then general counsel and later president of Cohig. Bean called Rappaport who said that he had no written contract with Khan and no records of what had been done in the performance of the contract with New Frontier. There was no copy of the New Frontier contract in the Englewood office of Cohig. On September 9, 1999, Bean sent by facsimile a letter to Visciano to disregard the demand letter from Poletti, dated September 8, 1999, indicating that Poletti had not been retained by Cohig and that Bean was investigating the circumstances surrounding the execution and performance of the consulting agreement. (Exhibit 27)

Under date of September 13, 1999, attorney Samuel S. Guzik wrote a letter to Bean on behalf of Khan, referring to the agreement entitling Khan to ninety per cent of Cohig's compensation under its agreement with New Frontier and demanding that Cohig enforce its registration rights for the warrants or pay Khan not less than $1,125,000 plus attorneys' fees as damages for interference with Khan's rights and also referring to Khan's action against Cohig in California in connection with the Ontro matter which Guzik said was evidence of a pattern and practice of misconduct actionable under federal racketerring statutes. (Exhibit 30)

Upon receipt of the Guzik letter of September 13, 1998, Bean called Rappaport and instructed him to cease contact with Khan because of the threatening tone of the Guzik letter. Bean asked for Rappaport's files concerning New Frontier and Khan. In a series of e-mails between Bean and Rappaport, Bean was not provided with any specifics concerning any services performed for New Frontier under the consulting agreement. Rappaport did provide a copy of a document, dated April 24, 1998, bearing signatures of Rappaport and Khan, identified as a Consulting and Finder's Compensation Agreement, which is asserted to be the contract which forms the basis for Khan's claim in this case that the defendants, New Frontier and

Weiner tortiously prevented Cohig from performing. The language of the document is unusual, particularly as to the following terms:

> 1. The parties irrevocably agree that Rafi Khan will receive 90% of all compensation, payment of value of any kind Cohig receives from or in respect of New Frontier, pursuant to the Investment Banking Consultant Agreement or otherwise.
>
> 2. The parties irrevocably agree that the above compensation to Rafi Khan is in return for good and sufficient consideration, and the parties agree that the introduction alone, already provided, is deemed good and sufficient consideration for the compensation to be paid to Rafi Khan pursuant to this Agreement.
>
> 3. Cohig irrevocably agrees to be responsible to ensure that Rafi Khan receives the compensation set forth in this Agreement and to take all necessary steps to ensure that Rafi Khan receives said compensation.
>
> 4. Both parties hereto agree not to do anything to reduce the value of compensation due to the other pursuant to this agreement or pursuant to the Investment Banking Consulting Agreement. (Exhibit 6)

Russell Bean consulted with Visciano and Weiner after both Bean and Weiner waived any conflict of interest arising because Visciano was representing Cohig in Kahn's lawsuit against it in California in connection with the Ontro matter.

Visciano advised the filing of a declaratory judgment action in Arapahoe County, Colorado, by New Frontier against Cohig & Associates and Rafi Khan, seeking a declaration that Cohig was not entitled to any warrants because it had not performed any services for the benefit of New Frontier and that Khan had no entitlement to benefits. Bean retained Dennis Graham, an experienced securities lawyer, to represent Cohig in the matter. Graham had represented Cohig in more than a dozen matters beginning in the early 1990's.

Graham reached the conclusion that the Khan-Rappaport document was fictitious, noting that the language quoted above was unusual and apparently written to support Khan's position in the dispute concerning entitlement to warrants. Additionally, Graham took the position that the Khan agreement was void in violation of securities regulations and raised that issue in his pleadings. Although served with process, Khan did not appear in the Arapahoe County action on the advice of Guzik who concluded that there was no personal jurisdiction

over Khan. The result was a default judgment declaring that Khan had no entitlement to warrants.

There was a mediation conference in the Arapahoe County case, ultimately resulting in a settlement of the dispute which was finalized by a court order declaring that New Frontier was not obligated to issue warrants under the consulting agreement with Cohig.

Bean made the decision that because no services had been provided to New Frontier, Cohig was not entitled to any warrants. While Rappaport argued strenuously that because the language of the agreement did not require services of the type provided for in the agreement to actually be performed unless requested and there was no documentation of any request for services, the warrants had been earned. Indeed, his position and that of the attorneys representing Khan was that the warrants were earned at the time of the execution of the consulting agreement. While the language of the document might be subject to that literal construction, the business decision by Bean not to seek enforcement on that interpretation was a reasonable business decision.

The claim of the plaintiff in this case is that he should recover the value of the warrants at the time of demand for them because the defendants tortiously interfered with the contract he had for ninety per cent of the warrants. Under Colorado law, the elements of that claim are as follows:

1. That the plaintiff had a contract with Cohig & Associates in which Cohig agreed to pay Khan ninety per cent of all compensation Cohig receives from New Frontier pursuant to the investment banking consultant agreement. The contract relied upon is Exhibit 6.

2. That the defendants knew or reasonably should have known of Exhibit 6.

3. That the defendants intentionally caused Cohig not to perform the contract with Khan by failing to enforce Cohig's entitlement to warrants under the investment banking consultant agreement.

4. That the defendants' interference with the contract was improper and

5. That the interference caused damages in the loss of the value of the warrants.

As noted earlier, there is a conflict in the evidence with respect to the knowledge of Weiner about Khan's participation at the time of the execution by Weiner of the consulting agreement. It is not necessary that the plaintiff establish that Weiner knew the details of the agreement or even that the Khan agreement, Plaintiff's Exhibit 6, was validly executed on April 24, 1998. Accordingly, it may be accepted that the plaintiff has proven by a preponderance of the evidence the existence of the contract and knowledge of it by defendant Weiner on behalf of defendant New Frontier.

The plaintiff has failed to prove by a preponderance of the evidence that the defendants improperly induced Cohig to fail to enforce a claim for warrants under the consulting agreement. The plaintiff has attempted to support a suspicion that the Arapahoe County lawsuit was collusive and brought to its conclusion for the purpose of avoiding Khan receiving the benefit of his agreement with Rappaport on behalf of Cohig. The plaintiff has made much of the role of Visciano as representing both New Frontier and Cohig at the same time. The record is clear that both Bean on behalf of Cohig and Weiner for New Frontier waived the conflict that could result from Visciano's appearance on behalf of Cohig in California and New Frontier in Colorado. The record is also clear that Bean had a prior legal relationship with Graham when he was retained to appear for Cohig in Arapahoe County and that Graham conducted a thorough investigation of the matter independently of Visciano. The lawsuit was not collusive and the decision by Bean not to pursue Rappaport's view of the contract was not induced or influenced by the defendants. Bean's position was an honorable one and was made with an appropriate regard for the business reputation of Cohig.

There is the suggestion that Bean on behalf of Cohig was persuaded to forego enforcement of the entitlement to warrants because of the potential for obtaining other benefits from New Frontier in other transactions. The evidence does not support any such inference. It is not necessary for this Court to determine whether Cohig was entitled to warrants without

performing services. All that is required is whether Bean's decision and that of his independent attorney, Graham, was the product of their own analysis of the circumstances unaffected by any acts or conduct of the defendants. It is this Court's view that the conduct of Rappaport and Khan in setting up this claim for warrants when New Frontier's stock had risen on the market was based on questionable legal contentions and Graham's concern about possible violations of securities laws and regulations was justified. Rappaport's employment with Cohig was terminated by Bean as a result of the circumstances giving rise to this litigation. That is strong support for the conclusion that Khan's failure to obtain the benefit of his deal with Rappaport was neither caused nor contributed to by any improper conduct by these defendants. It is therefore

ORDERED that judgment shall enter for the defendants, dismissing the plaintiff's claim and for the award of costs.

DATED: September 7, 2005

BY THE COURT:

Richard P. Matsch, Senior District Judge